**UNITED STATES of America**

v.

**Eric C. WILSON, Defendant.**

**No. 8:10–CR–68.**

United States District Court,
N.D. New York.

Dec. 8, 2010.

United States Attorney, Plattsburgh Office, Elizabeth A. Horsman, Esq., Of Counsel, Plattsburgh, NY, for United States of America.

Towne, Ryan & Partners, P.C., Michael Rhodes–Devey, Esq., Of Counsel, Albany, NY, for Defendants.

## MEMORANDUM–DECISION & ORDER

DAVID N. HURD, District Judge.

### I. INTRODUCTION

Defendant Eric C. Wilson ("Wilson" or "defendant") is charged in a one count indictment with possessing with the intent to distribute marijuana on January 28, 2010, in violation of Title 21, United States Code, Section 841(a)(1). Defendant has made a motion pursuant to Federal Rules of Criminal Procedure 12(b)(3)(C) to suppress the evidence seized during the search of the green Pontiac Bonneville he was driving on the above date. The United States of America (the "Government") opposes defendant's motion.

A suppression hearing was held on September 1, 2010, in Utica, New York. After the hearing the parties were afforded time to review a transcript of the proceedings and submit their proposed findings of fact and conclusions of law. Those submissions have been received and reviewed together with the transcript.[1]

### II. FINDINGS OF FACT

On January 28, 2010, at approximately 9:00 a.m., St. Regis Mohawk Police Department ("SRMPD") Officer Virginia Johnson ("Johnson") was observing traffic on a part of the St. Regis Mohawk Reservation ("St. Regis" reservation or territory) immediately adjacent to the United States–Canada border.[2] Johnson observed a white male driving a green Pontiac Bonneville heading north on River Road within the territory of the St. Regis reservation. The vehicle was driving toward an unguarded and unmarked border crossing into Quebec. Tr. 45, 46, 48. Johnson alerted the Akwesasne Mohawk Police Service (AMPS) in Quebec about the green Pontiac Bonneville that she observed enter Canada. AMPS officers located the vehicle and observed it and its white male driver exit Quebec and reenter the United States at the same location on River Road.[3] Tr. 48, 93.

During this time, SRMPD Detective–Sergeant Rourke ("Sgt. Rourke") was in his office in Hogansburg, New York, monitoring radio traffic when he heard Johnson and AMPS report over the radio. Tr. 46. He and SRMPD Investigator Peter Barnes ("Inv. Barnes") then left the SRMPD in Inv. Barnes's vehicle. Within minutes of receiving the information from the SRMPD and AMPS about the uninspected vehicle having exited and reentered the United States, Sgt. Rourke and Inv. Barnes located the green Pontiac Bonneville. They first observed the vehicle stopped and fueling up at Truck Stop # 9 at the intersection of Cook Road and New York State Route 37 ("Route 37") in Hogansburg, New York. Tr. 54, 94. Truck Stop # 9 is located outside the recognized territory of the St. Regis reservation. Tr. 54, 71. It is along an approximately one and a one-half mile section of Route 37 that bisects and joins sections of the St. Regis reservation. Tr. 70. Sgt. Rourke and Inv. Barnes observed the vehicle turn onto Cook Road and then turn onto Route

---

**1.** All references to the transcript of the suppression hearing will be cited as "Tr." All exhibits received during the suppression hearing will be referred to as "Ex."

**2.** The Akwesasne Territory spans the United States–Canada border. In Canada it stretches over Quebec and Ontario. The Akwesasne Territory is essentially divided into two areas, the St. Regis Mohawk Reservation in New York, and the Akwesasne Mohawk Reservation in Canada. There are areas in the Akwesasne Territory where a person can drive a vehicle or boat from the United States into Canada and return without passing through a United States port of entry.

**3.** These observations were communicated over a police radio.

37 heading west. Tr. 54, 81, 94. They followed the vehicle a short distance as it proceeded westbound on Route 37, but noted that its rear license plate was obstructed by snow and road debris. Tr. 54.[4]

At approximately 9:17 a.m. Sgt. Rourke directed Inv. Barnes, who was driving the vehicle, to pull the green Pontiac Bonneville over. They stopped the vehicle close to the intersection of Route 37 and Route 37C in the Town of Bombay, New York. Tr. 81, 95. The parties agree that the location at which the vehicle was stopped is not within the recognized territory of the St. Regis reservation. Tr. 69, 70, 72.[5] After yielding the vehicle, Inv. Barnes got out of the police vehicle and dusted off the license plate to read it. Sgt. Rourke called the SRMPD station to report the stop and read the plate to the dispatcher. Tr. 55. Inv. Barnes approached the driver's side window and asked for identification and registration, where the driver was coming from, and what he was doing. Tr. 59, 95. At the same time, Sgt. Rourke approached the passenger's side window. Tr. 55. The driver identified himself as the defendant, Eric C. Wilson,[6] and said he was coming from his home in St. Regis Falls, New York,[7] and heading to work for Phillip Tarbell. Tr. 95, 96. The defendant told Inv. Barnes that he made one stop, to get fuel at Truck Stop # 9. Inv. Barnes returned to the vehicle and advised Sgt. Rourke what the defendant had said, which they knew to be false based upon the radio observations they had previously heard from Johnson and AMPS. Tr. 59, 96, 97. A record check showed the vehicle was registered to Phillip Tarbell, who was absent from the scene and known by Sgt. Rourke and Inv. Barnes to have been arrested recently near Watertown, New York, with about 20 pounds of marijuana. Tr. 61.[8]

At or around the same time that Sgt. Rourke learned of the registered owner of the vehicle, he telephoned Immigration Customs Enforcement ("ICE") Agent in Charge Mario Fiacco ("Fiacco") and advised him of his intention to conduct a Title 19 customs search of the vehicle.[9] Tr. 56. Fiacco gave permission to do the search. Tr. 57. At some point after that phone call, Sgt. Rourke approached Wilson to conduct a second interview. He asked Wilson where he was coming from and where he was headed. Defendant replied that he was coming from his home in St. Regis Falls to work and stopped to get

---

4. Defendant disputes that his license plate was obstructed by snow or debris.

5. The route from Truck Stop # 9 to the location where the vehicle was subsequently pulled over is also located outside the territory of the St. Regis reservation.

6. It is uncontested that the defendant is a United States citizen and resides in the United States. He has a New York State driver's license that lists his address as St. Regis Falls, New York. The defendant does not enjoy North American Indian status in the United States or Canada.

7. St. Regis Falls, New York, is in Franklin County, New York, approximately 45 minutes south west of the location where the vehicle stop occurred. Tr. 60.

8. At some point during the time the vehicle was stopped, Johnson came to the location of the stop and positively identified the vehicle and driver as those she had observed leave the United States and return over the reservation. Tr. 106. It is unclear from the record at what point Johnson arrived at the stop. Johnson did not testify at the suppression hearing and is no longer employed by the SRMPD.

9. It is unclear whether Sgt. Rourke called Fiacco before or after receiving the information regarding defendant's license and vehicle registration. Regardless, the distinction is irrelevant for purposes of this discussion.

fuel at Truck Stop # 9 with no other stops. Tr. 60. Because Sgt. Rourke knew this was false, he asked the defendant, "What if I told you that you had been to Canada?"; Wilson then admitted he had been in Quebec to see a friend. Sgt. Rourke asked if he went there to "score a little" to which defendant replied "yes" and said he went to a friend's house in Canada to obtain a small amount of marijuana before going to work. Tr. 62. Sgt. Rourke asked him if he had anything illegal on him and he admitted to possessing a marijuana pipe. Tr. 62.

At this time United States Border Patrol ("USBP") Agents Justin Chamberlain ("Agent Chamberlain") and David Marston ("Agent Marston") arrived on the scene. Agent Chamberlain conducted an interview with Wilson while he was still in the vehicle. He told the Agent he had been to Canada and back, and the Agent informed him he was going to conduct a Title 19 customs search of the vehicle. Agent Chamberlain asked defendant if there was anything illegal in the vehicle or anything that he might not know of in the vehicle since it did not belong to him. Tr. 112, 113. Defendant admitted to having a marijuana pipe on him and the Agent instructed he place it on the floor of the vehicle. Tr. 113. Agent Chamberlain then told defendant he was going to conduct a search and asked him to get out of the vehicle. Tr. 113. He indicated to Inv. Barnes that defendant consented to a search of the vehicle. Tr. 98. Inv. Barnes advised Sgt. Rourke that he was going to help Agent Chamberlain search the vehicle.

Agent Chamberlain began the search at the front of the vehicle. Tr. 113. Near the completion of the search Inv. Barnes pushed the trunk release button located inside the glove compartment. Tr. 98, 113. After the trunk opened the officers observed three black duffel bags in the trunk. Tr. 113, 114. The three large hockey-type bags inside the trunk contained a green leafy substance that appeared to be marijuana. Tr. 98, 99. A field test on the substance indicated it was marijuana and a later analysis revealed the three bags contained a total of 124.544 pounds of marijuana. Tr. 99, 114. Agents Chamberlain and Marston then transported Wilson to the SRMPD.

## III.  CONCLUSIONS OF LAW

It is undisputed that Truck Stop # 9 and the location where Wilson's vehicle was stopped are outside the legal boundary of the St. Regis reservation.[10] It is also undisputed that the two SRMPD officers who stopped the vehicle are police officers whose authority is derived from New York Criminal Procedure Law Section 1.20(34)(u)[11] and New York Indian Law Section 114. Section 114(8), titled St. Regis Mohawk tribal police, provides:

A person appointed a police officer under this section shall only be permitted to exercise the duties or functions of a police officer within the county of Franklin, and within that county, *only within the boundary of the St. Regis reservation; except that such officer may follow a person for whom he or she has the authority to arrest on the reservation in continuous close pursuit, com-*

**10.**  Ironically, had Sgt. Rourke waited a few minutes, the vehicle would have been back on the St. Regis reservation. Tr. 70–74. However Sgt. Rourke testified that had he not stopped the vehicle, it could have also departed the area by heading south, away from the border and the reservation. Tr. 74–75.

**11.**  Section 34(u) provides that the following persons are police officers: "Persons appointed as Indian police officers pursuant to section one hundred fourteen of the Indian law."

*mencing on the reservation,* in and through any county of the state, *and may arrest such person* in any county in which the officer apprehends him or her. N.Y. Indian Law § 114(8)(McKinney 2010) (emphasis added). Therefore unless the exception in Section 114(8) applies or the SRMPD officers possessed independent authority to conduct the stop, they were without the power to seize the vehicle off of the St. Regis territory. Without such authority, the evidence seized from the green Pontiac Bonneville must be suppressed.

### A. *Title 19*

The Government maintains that the stop of Wilson's vehicle was a customs inspection under Title 19. The parties stipulated that Sgt. Rourke is one of two SRMPD officers cross-designated by ICE as a customs officer under 19 U.S.C. § 1401(i).[12] Tr. 44. ICE Special Agent Jeramy Whitling ("Agent Whitling") testified that according to a Memorandum of Understanding between the ICE Special Agent in Charge and the SRMPD, the cross-designation of SRMPD officers as ICE agents "authorizes customs searches at the border or the functional equivalent of the border. It also delegates arrest authority without warrant for any offense against the United States and for any felony recognizable by the laws of the United States if he or she has probable cause." Tr. 15; Gov. Ex. 9.

Sgt. Rourke's delegated authority was effective February 25, 2008, and is detailed in the executed designation form appointing him as a customs officer. *See* Gov. Ex. 1; Tr. 27–28 ("Designation Agreement"). The Designation Agreement provides: "Pursuant to the provisions of 19 U.S.C. 1401(i) ... you are hereby designated a Customs Officer (Excepted) without addi-

tional compensation." Gov. Ex. 1. It further states: "Endorsements and Restrictions: *Prior* to the examination or search of any aircraft, vehicle, vessel or cargo, the appropriate Special Agent in Charge or Resident Agent in Charge, will be contacted and advised of the nature of the activity." *Id.* (emphasis added). Therefore *in order for a SRMPD officer who is cross-designated as an ICE agent to act under Title 19 authority, he must, prior to engaging in any act under the authority of the Designation Agreement, coordinate and approve such conduct with the appropriate ICE agent in charge.*

■ The parties belabor issues such as whether the stop was at a functional equivalent of the border, whether Sgt. Rourke and Inv. Barnes were border patrol agents on roving patrol, and whether roving patrols may make such stops. There was also briefing on the Fourth Amendment right to be free from unreasonable searches and seizures and the exception for searches conducted at a border. However these issues need not be addressed because Sgt. Rourke did not obtain authorization *prior* to conducting the stop. Tr. 56–58, 84. He testified that he and Inv. Barnes yielded defendant's vehicle near the intersection of Route 37 and Route 37C and that they interviewed Wilson and processed his identification and plates all before he called Agent in Charge Fiacco to obtain Title 19 authorization.

The authorization later granted by Fiacco is irrelevant because there was no authority to conduct the stop in the first place under Title 19 without prior authorization. In the absence of any prior approval from Fiacco, it was not a customs inspection search of defendant's vehicle. Sgt. Rourke and Inv. Barnes were not

12. According to the Government, ICE delegated Title 19 authority to select, trained members of the SRMPD to facilitate the com-

plex policing of the United States–Canada border and smuggling on the reservation. Tr. 11–19, 44.

acting as customs officers at the time of the stop.

### B. *New York Indian Law Section 114(8)*

The Government argues the SRMPD officers were authorized to make the stop under New York Indian Law Section 114(8). In the alternative they claim that even if the jurisdiction for the stop was technically deficient, the officers' conduct does not constitute an unreasonable search or seizure under the Fourth Amendment.

■ As previously noted, a St. Regis tribal police officer's jurisdiction is limited to the St. Regis territory. However, under Section 114(8), *an officer may follow a person for whom he has the authority to arrest on the reservation in continuous close pursuit, beginning on the reservation,* and may arrest such person off the reservation. The issue is therefore whether Sgt. Rourke and Inv. Barnes had the authority to arrest the defendant on the reservation.

At the outset, it should be noted that Section 114(8) requires an officer to follow such a person in continuous close pursuit, commencing on the reservation. Here, Sgt. Rourke and Inv. Barnes first observed defendant's vehicle at Truck Stop # 9, which is not on the St. Regis reservation. Even assuming, arguendo, that this requirement was satisfied by Johnson's and AMPS' radio reports observing the progress of the green Pontiac Bonneville from the United States–Canada border on the reservation, to Truck Stop # 9 off the reservation, the Government cannot rely on Section 114(8) because there was no basis to arrest Wilson.

■ The Government contends that the defendant's entry into the United States at a place other than at a border crossing point—through the St. Regis reservation—gave the officers the authority to arrest Wilson. A police officer may arrest a person without a warrant when the officer has probable cause to believe that the person has committed a crime. *People v. Johnson,* 66 N.Y.2d 398, 402, 497 N.Y.S.2d 618, 488 N.E.2d 439 (1985). While probable cause does not require the same amount of proof needed to sustain a conviction, it does require "sufficiently specific and detailed description[s] and circumstances which would lead a police officer to reasonably conclude that the defendant was the perpetrator of the crime." *People v. Harris,* 224 A.D.2d 711, 711, 639 N.Y.S.2d 427 (N.Y.App.Div. 2d Dep't 1996). *See also People v. Bigelow,* 66 N.Y.2d 417, 423, 497 N.Y.S.2d 630, 488 N.E.2d 451 (1985); *People v. Kennedy,* 282 A.D.2d 759, 759–60, 726 N.Y.S.2d 109 (N.Y.App.Div. 2d Dep't 2001).

According to the Government there are areas in the Akwesasne Territory where a person can drive a vehicle or boat from the United States into Canada and return without passing through a United States port of entry. People who enjoy North American Indian status in the United States or Canada can cross freely and are not subject to inspection. Tr. 52. Any person who is a non-native is subject to an inspection. Tr. 52. According to Special Agent Whitling, 19 U.S.C. § 1433 requires that every person who is a non-native report to a port of entry without stopping. Tr. 20–22. Section 1433(b) provides that vehicles entering the United States must do so at a designated port of entry and must present themselves, their vehicle, and all merchandise in that vehicle for inspection. 19 U.S.C. § 1433(b)(2006).

The parties agree that there is no port of entry for either Canada or the United States on River Road, where the defendant crossed the border. In the area of the St. Regis reservation, on the United States side, there are two ports of entry—the port of Fort Covington, New York, nine

miles to the east of Route 37 and the port of Massena, New York, six miles to the west of Route 37. Tr. 32–35, 38. The Government has pointed to no law which makes, alone, the act of crossing the United States–Canada border on the Akwesasne Territory by a non-native a crime.

Nor has the Government established that the SRMPD officers developed probable cause to arrest based solely on the AMPS radio report and Johnson's observations. The radio traffic provided minimal details and lacked identification of Wilson and the vehicle. The reports indicated the vehicle was a green Pontiac Bonneville but did not provide a license plate number and identified the driver as a white male with no further description. Sgt. Rourke and Inv. Barnes did not personally observe Wilson's actions and did not locate him until he was at Truck Stop # 9, after he allegedly crossed the United States–Canada border on River Road.

Further, Section 1433(b) requires vehicles entering the United States to present themselves immediately upon entry to a port of entry. However the statute does not specify that a vehicle must do so without stopping. The Massena port is located approximately five miles from Truck Stop # 9 where the SRMPD officers first observed defendant's vehicle. Inv. Barnes testified that the quickest route from the area in Canada where defendant was coming from to the Massena crossing is south on River Road to Cook Road, Cook Road to Route 37, and then Route 37 due west all the way to leave the reservation. Tr. 101. He conceded that at the time he and Sgt. Rourke were following defendant's vehicle, Wilson was, in fact, traveling the most direct possible route to the closest border crossing to which a person could report. Tr. 101–02. There was no testimony that defendant intended to avoid reporting to a port of entry.

Sgt. Rourke and Inv. Barnes did not have probable cause to arrest the defendant on the reservation. They did not have specific facts which lead them to believe that the defendant committed a crime, nor did their pursuit of Wilson's vehicle even begin on the reservation. Because they had no basis to arrest Wilson on the St. Regis reservation, Sgt. Rourke and Inv. Barnes cannot rely on Section 114(8) to arrest defendant off the reservation.

In the alternative, the Government argues that even if the officers are not saved by the close pursuit exception in Section 114(8), their actions do not constitute an unreasonable search or seizure under the Fourth Amendment because extraterritorial arrests are constitutional. *See, e.g., State v. Layne,* 6 F.3d 396, 399 (6th Cir. 1993) (finding that arrest made by Tennessee sheriff outside his geographical jurisdiction was valid under Tennessee private citizen arrest statute because it was based on probable cause and thus did not violate Fourth Amendment); *Pasiewicz v. Lake Cnty. Forest Pres. Dist.,* 270 F.3d 520, 527 (7th Cir.2001) (declining to decide whether arrest outside officer's jurisdiction was unconstitutional because violation of a state statute [presumably one limiting officer's jurisdiction] is not a *per se* constitutional violation and officers acted reasonably under Fourth Amendment); *United States v. Mikulski,* 317 F.3d 1228, 1233 (10th Cir.2003) (finding extraterritorial arrest constitutional based on totality of circumstances despite violation of state law requiring officer to contact local law enforcement authority before investigation). *But cf. United States v. McCall,* No. 06CR14A, 2007 WL 1845584, at *6 (W.D.N.Y. June 21, 2007) (holding that Buffalo Municipal Housing Authority ("BMHA") officers lacked authority to stop defendant for traffic infraction occurring beyond their geographic area of em-

ployment [their jurisdiction being BMHA property] and suppressing evidence subsequently seized); *United States v. Green,* 178 F.3d 1099, 1106 (10th Cir.1999) (upholding a warranted search by officers outside their territorial jurisdiction and noting "[a] warrantless arrest is vastly different from a warranted search"); *Ross v. Neff,* 905 F.2d 1349, 1353–54 (10th Cir. 1990) (holding that arrest made outside officer's jurisdiction, absent exigent circumstances, violates Fourth Amendment); *United States v. Foster,* 566 F.Supp. 1403, 1412 (D.D.C.1983) (holding that the "concept of reasonableness embodied in the Fourth Amendment logically presupposes an exercise of lawful authority by a police officer").

As previously noted the SRMPD had no legal authority to conduct a stop off the reservation, had no warrant, and did not have probable cause to believe Wilson committed a crime. The Government cannot overcome the invalidity of the stop by pointing to the citizen's arrest provisions of New York's Criminal Procedure Law because Sgt. Rourke and Inv. Barnes were acting as police officers when they conducted the stop. *See* N.Y.Crim. Proc. Law §§ 140.35, 140.40 (McKinney 2010) (permitting citizen's arrest by person acting other than as a police officer or peace officer); *cf. People v. Lahr,* 147 Ill.2d 379, 168 Ill.Dec. 139, 589 N.E.2d 539, 540–41 (1992) (finding that police officer's extraterritorial arrest of speeding motorist was not a valid citizen's arrest because he acted as police officer to obtain information not otherwise available); *People v. Williams,* 4 N.Y.3d 535, 538–39, 797 N.Y.S.2d 35, 829 N.E.2d 1203 (2005) (suppressing evidence obtained during traffic stop by BMHA officers outside their geographical jurisdiction and finding citizen's

arrest provision inapplicable because officers were acting under color of law); *McKinley v. Commonwealth,* 564 Pa. 565, 769 A.2d 1153, 1164 n. 18 (2001) ("[I]n this Commonwealth an unauthorized, extraterritorial stop and arrest by a uniformed officer displaying accouterments of state authority is analyzed as an illegal encounter.").

Sgt. Rourke and Inv. Barnes were acting in their official capacities as on duty SRMPD officers when they seized defendant's vehicle and the stop cannot be justified as a citizen's arrest.

## C. *Terry v. Ohio*

The Government alternatively argues that even if the vehicle stop was not a Title 19 customs search or authorized under Section 114(8) it was nonetheless proper under *Terry v. Ohio* given the reasonable suspicion of criminal activity due to the defendant's exit from and reentry to the United States and the alleged traffic violation of an obstructed rear license plate.[13]

Law enforcement officers are authorized to conduct a traffic stop or detain an individual for investigative purposes, known as a *Terry* stop, so long as the officer has reasonable suspicion that an individual is or has been engaged in criminal activity. *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968); *United States v. Bayless,* 201 F.3d 116, 132–33 (2d Cir.2000). "A Terry stop represents an intermediate response allowing police to pursue a limited investigation when they lack the precise level of information necessary for probable cause to arrest." *United States v. Elmore,* 482 F.3d 172, 178 (2d Cir.2007).

---

**13.** Defendant was never charged with a violation of the Vehicle and Traffic Law for the allegedly obstructed rear license plate.

■ There is no need to determine whether reasonable suspicion existed to satisfy a *Terry* stop because the fact remains that, as SRMPD officers, Sgt. Rourke and Inv. Barnes did not have authority to conduct a *Terry* stop outside of the boundary of the St. Regis reservation. As previously discussed, they were appointed as police officers by the New York State Police. *See* Gov. Ex. 6. That appointment was made "[p]ursuant to Section 114 of the Indian Law" which as described, limits the authority of St. Regis tribal police officers to the St. Regis reservation. While, as Sgt. Rourke testified, they have state police authority to conduct vehicle and traffic law investigations, that authority is limited by Section 114(8). Tr. 84–85.

Accordingly, Sgt. Rourke and Inv. Barnes had no legal authority as police officers to conduct a *Terry* stop off the St. Regis reservation.

### D. *Inevitable Discovery*

In its final effort to defeat defendant's motion to suppress, the Government claims the evidence should be saved by the inevitable discovery doctrine. This last attempt to oppose the suppression of evidence obtained in an otherwise unlawful seizure of Wilson's vehicle merits little discussion.

■ The inevitable discovery exception rests upon the principle that the remedial purposes of the exclusionary rule are not served by suppressing evidence discovered through a later, lawful seizure that is genuinely independent of an earlier, tainted one. *Murray v. United States*, 487 U.S. 533, 542, 545, 108 S.Ct. 2529, 2537, 101 L.Ed.2d 472 (1988) ("When the seizure of the evidence at issue is 'wholly independent of' the constitutional violation, then exclusion arguably will have no effect on a law enforcement officer's incentive to commit an unlawful search."); *Nix v.*

*Williams*, 467 U.S. 431, 447, 104 S.Ct. 2501, 2511, 81 L.Ed.2d 377 (1984); *United States v. Mendez*, 315 F.3d 132, 137 (2002); *United States v. Roberts*, 852 F.2d 671, 675–76 (2d Cir.1987), *cert. denied*, 488 U.S. 993, 109 S.Ct. 556, 102 L.Ed.2d 583 (1988). To admit contested evidence, the government must "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix*, 467 U.S. at 444, 104 S.Ct. at 2509.

■ Agent Chamberlain testified that based upon radio traffic he was looking for and intended to stop the green Pontiac Bonneville once he encountered it. Tr. 110. The Government contends that Agent Chamberlain placed himself in a position to locate the vehicle based upon the reported direction of travel and that he had the authority to conduct a Title 19 search as a USBP Agent. Had he made the stop himself "there is a very high probability that he and his drug detection canine partner would have discovered the marijuana." Gov. Proposed Findings of Fact and Conclusions of Law, Dkt. No. 28, 16. On these facts the Government argues the inevitable discovery exception should save the evidence because, in essence, the SRMPD officers stopped the vehicle before Agent Chamberlain had a chance to.

The inevitable discovery exception does not apply here. There are a variety of factors out of Agent Chamberlain's control that could have intervened and prevented him from even locating the vehicle, let alone guarantee the stop and search of the vehicle and the subsequent seizure of the marijuana. To conclude that the Government has failed to establish the inevitable discovery of the marijuana by a preponderance of the evidence is generous to say the least. The inevitable discovery doctrine, on these facts, does not cancel out

the otherwise unlawful search and seizure of Wilson's vehicle.

## IV. *CONCLUSION*

Sgt. Rourke and Inv. Barnes' stop of Wilson's vehicle was outside the legal boundary of the St. Regis Mohawk Reservation and thus they lacked authority to conduct the stop as St. Regis Mohawk tribal police officers. Although Sgt. Rourke possessed delegated Title 19 authority to act as a customs officer, he failed to notify the ICE agent in charge before stopping defendant's vehicle as required by the Designation Agreement. Because he did not telephone the agent in charge and obtain authorization *prior* to performing his Title 19 duties, he was not acting in his Title 19 capacity when he and Inv. Barnes seized defendant's vehicle near the intersection of Route 37 and Route 37C.

Likewise, Sgt. Rourke and Inv. Barnes cannot rely on New York Indian Law Section 114(8) to validate the stop of Wilson's vehicle off the reservation. Their pursuit did not commence on the reservation because they did not observe Wilson's vehicle until it was at Truck Stop # 9, located off the reservation. Nor did they have probable cause to arrest Wilson within the boundary of the St. Regis territory based solely on the radio traffic reports and their speculation that he was not going to report to a port of entry as required by 19 U.S.C. § 1433(b).

While Wilson's exit from and reentry to the United States within a short time frame coupled with the officers' knowledge of drug trafficking behavior in the area may have been enough to establish reasonable suspicion to justify a *Terry* stop, the fact remains that as SRMPD officers, Sgt. Rourke and Inv. Barnes did not have authority to conduct a *Terry* stop outside of the boundary of the St. Regis Mohawk Reservation. Because they were acting in their official capacities as on duty SRMPD officers, the stop cannot be justified as a citizen's arrest.

Lastly, simply because Agent Chamberlain was allegedly planning to stop the vehicle and had the authority to do so as a USBP Agent does not mean that the discovery of the marijuana in the trunk was inevitable. The Government has failed to establish its inevitable discovery by a preponderance of the evidence and thus this exception will not save the otherwise unlawful seizure.

Accordingly,

it is ORDERED that

1. Defendant's motion pursuant to Federal Rules of Criminal Procedure 12(b)(3)(C) to suppress the evidence obtained on January 28, 2010, is GRANTED;

2. The 124.544 pounds of marijuana seized from the trunk of the green Pontiac Bonneville on January 28, 2010, is SUPPRESSED;

3. The Government is precluded from introducing the above at trial or making any reference to same; and

4. The Indictment shall be dismissed and a judgment of acquittal entered unless the Government files a statement on or before January 7, 2011, that it intends to continue with the case.

IT IS SO ORDERED.